# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE PROASSURANCE CORP. | ) | |
| STOCKHOLDER DERIVATIVE | ) | Consol. C.A. No. 2022-0034-LWW |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: June 6, 2023
Date Decided: October 2, 2023

Thomas A. Uebler, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Melinda A. Nicholson & Nicolas Kravitz, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; Benjamin I. Sachs-Michaels, GLANCY PRONGAY & MURRAY LLP, New York, New York; Robert V. Prongay & Pavithra Rajesh, GLANCY PRONGAY & MURRAY LLP, Los Angeles, California; *Counsel for Plaintiffs Fanourios Ferderigos & Morton Goldfarb*

Raymond J. DiCamillo, Kevin M. Gallagher & Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jonathan Youngwood, Janet A. Gochman & Jacob Lundqvist, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendants Edward L. Rand, Jr., W. Stancil Starnes, Dana S. Hendricks, Howard Friedman, Michael Boguski, Thomas A. S. Wilson Jr., Kedrick D. Adkins Jr., Bruce D. Angiolillo, Samuel A. Di Piazza Jr., Maye Head Frei, M. James Gorrie, Ziad R. Haydar, Frank A. Spinosa, Katisha T. Vance, Robert E. Flowers, and Nominal Defendant ProAssurance Corp.*

**WILL, Vice Chancellor**

ProAssurance Corp., one of the nation's largest healthcare professional liability insurance providers, traditionally insured small accounts. But in 2015, the company decided to follow industry trends and signed a policy with a large healthcare institution called TeamHealth. The larger account meant greater exposure to high severity claims. By mid-2018, TeamHealth's claims had grown more frequent. By 2020, ProAssurance announced that its loss reserves had been inadequate.

These events, quite obviously, involve a commercial decision that went poorly—the stuff that business judgment is made of. Yet the plaintiffs in this action seek to hold ProAssurance's directors and officers accountable based on oversight and disclosure theories. Because it is not substantially likely that ProAssurance's independent and disinterested board faces liability for either claim, the action cannot proceed.

Oversight claims should be reserved for extreme events. The point is to maintain a baseline expectation that fiduciaries try, in good faith, to monitor key corporate risks and ensure that the entity operates lawfully. For liability to arise, the directors' oversight failures must be so egregious that they amount to bad faith. That is, the directors utterly failed to implement a reporting system or consciously disregarded a violation of positive law.

1

The allegations here suggest nothing of the sort. ProAssurance's board regularly received updates on the company's underwriting practices and reserves. It properly delegated these tasks to management and was guided by actuaries and auditors. The only so-called red flags were of business risks—not illegality. How (and whether) to respond was entirely within the directors' discretion.

The plaintiffs' disclosure claim fares no better. The plaintiffs insist that disclosures describing ProAssurance's conservative practices are materially misleading in view of the TeamHealth account. But the complaint lacks particularized allegations that the directors issued the disclosures knowing that they were false. To the contrary, the complaint and board materials incorporated into it show the board was told that management was taking a thoughtful—even cautious—approach to emerging trends and that the company's loss reserves were reasonable.

Ultimately, the plaintiffs have not pleaded specific facts from which disloyalty can be inferred. ProAssurance's board had a reporting system in place. There is no suggestion that ProAssurance was breaking the law. And the complaint lacks particularized allegations that any false disclosures were made with scienter.

Because the plaintiffs come nowhere close to demonstrating that a majority of the board could not impartially consider a pre-suit demand, the action is dismissed under Rule 23.1.

## I. RELEVANT BACKGROUND

The following facts are drawn from the Consolidated Amended Verified Stockholder Derivative Complaint (the "Complaint"), the documents it incorporates by reference, and certain public documents.[1]

### A. ProAssurance's Business

Nominal defendant ProAssurance Corp. (the "Company"), a Delaware corporation, is a holding company for property and casualty insurance companies.[2]

---

[1] *See* Verified S'holder Deriv. Consol. Compl. (Dkt. 8) ("Compl."); *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms.") (citation omitted); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint.") (citation omitted); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))). The parties agreed that all books and records produced to the plaintiffs pursuant to 8 *Del. C.* § 220 are incorporated by reference into the Complaint. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

Exhibits to the Transmittal Affidavit of Melissa A. Lagoumis in Support of the Defendants' Opening Brief in Support of their Motion to Dismiss the Verified Stockholder Derivative Consolidated Complaint and, Alternatively, to Stay the Action are cited as "Defs.' Opening Br. Ex. __." *See* Dkt. 18. Exhibits to the Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss the Verified Stockholder Derivative Complaint and, Alternatively, to Stay the Action are cited as "Pls.' Answering Br. Ex. ___." *See* Dkt. 29. Exhibits to the Transmittal Affidavit of Nicholas F. Mastria in Support of Defendants' Reply Brief in Further Support of Their Motion to Dismiss the Verified Stockholder Derivative Consolidated Complaint and, Alternatively to Stay the Action are cited as "Defs.' Reply Br. Ex. __." *See* Dkt. 37. Certain documents are cited by the last three digits of their Bates stamps.

[2] Compl. ¶¶ 1, 21; *see* Defs.' Opening Br. Ex. 1 (2021 Form 10-K) at 9.

3

Its largest operating segment is Specialty Property & Casualty ("SP&C"), which includes a healthcare professional liability insurance ("HCPL") segment.[3] Revenue derived from HCPL premiums constitutes a significant portion of ProAssurance's SP&C business.[4]

HCPL policies protect healthcare professionals from negligence and other claims like medical malpractice.[5] Due to delays between the time of treatment and the filing of a malpractice claim, companies like ProAssurance often issue "claims-made" policies rather than "occurrence-based" policies.[6] A claims-made policy provides coverage for claims filed during the active policy year.[7] An occurrence-based policy provides coverage for claims arising from events transpiring during the active policy year, even if the claims are brought long after.[8]

For several decades, over 90% of ProAssurance's HCPL business was underwriting professional liability policies for solo practitioners or smaller physician groups.[9] This approach, combined with a focus on claims-made policies, allowed

---

[3] Compl. ¶¶ 1, 43. The SP&C segment generated 53% of PRA's consolidated revenue and 59% of its consolidated net premiums in 2018 and 2019. *Id.* ¶ 43.

[4] *Id.* ¶ 1.

[5] *Id.* ¶ 44.

[6] *Id.*

[7] *Id.* ¶ 45.

[8] *Id.* ¶ 46.

[9] *Id.* ¶¶ 63, 96.

ProAssurance to reasonably estimate its future losses, manage risk, and set appropriate reserves.[10] ProAssurance's longstanding strategy also involved conservativism in maintaining loss reserves.[11] Loss reserves represent expected future losses that the Company will pay for covered claims.[12] To recognize these liabilities, ProAssurance establishes loss reserves as balance sheet liabilities with corresponding income statement charges representing the anticipated amount needed to settle claims.[13]

ProAssurance's public filings describe its processes for recording loss reserves.[14] Its disclosures explain that to develop reserves, the Company hires independent consultants applying actuarial methodologies and a statistical review of claims data to evaluate changes in severity trends.[15] According to the Company, there are "multiple uncertainties" inherent in estimating loss reserves, including "claim frequency and severity."[16]

---

[10] *Id.* ¶¶ 47, 68.

[11] *Id.* ¶¶ 2, 54.

[12] *Id.* ¶ 54.

[13] *Id.*

[14] *See id.*; Defs.' Opening Br. Ex. 2 (2018 Form 10-K) at 38.

[15] *See, e.g.*, Defs.' Opening Br. Ex. 3 (2017 Form 10-K) at 36-37 (describing the "very detailed," "highly technical," and "highly judgmental" actuarial process); Defs.' Opening Br. Ex. 2 at 40-41 (same).

[16] *See* Defs.' Opening Br. Ex. 2 at 178; Defs.' Opening Br. Ex. 3 at 19.

In each accounting period, the adequacy of loss reserves for unpaid claims is reassessed and may be adjusted to ensure there are funds to cover filed claims.[17] If loss reserves are inadequate, the Company's net income is overstated by understating its expenses.[18]

## B.    The TeamHealth Account

Around 2015, the HCPL competitive marketplace shifted toward underwriting policies for larger physician groups, hospitals, and major national healthcare provider entities.[19] ProAssurance began to consider underwriting larger group accounts "to remain relevant as the healthcare industry evolve[d] toward delivery of care through larger and more complex entities."[20] The Company soon created a subcommittee of underwriters called the "National Healthcare Team," led by the Company's then-President of Healthcare Professional Liability Howard Friedman, to sell HPCL policies to large physician groups.[21]

On August 3, 2016, ProAssurance announced that it had added large accounts in the HCPL segment, including "a significant multi-state physician group that

---

[17] Compl. ¶ 55.

[18] *Id.* ¶ 57.

[19] *Id.* ¶ 63.

[20] Defs.' Opening Br. Ex. 4 (Feb. 19, 2018 Audit Committee minutes) at '582; Compl. ¶¶ 63, 79.

[21] Compl. ¶¶ 25, 63. Friedman served as President of Healthcare Professional Liability at ProAssurance from January 2014 to May 2019, and has worked for the Company since 1996. *Id.* ¶ 25.

represented the single largest premium ever billed by ProAssurance."[22] This account (though not identified by name) was TeamHealth, a national provider of outsourced physician services employing over 18,000 clinicians and serving approximately 3,400 healthcare provider facilities.[23] The TeamHealth policy required the Company to provide $60 million of coverage excess of an aggregated retention (i.e., risk that remained with TeamHealth) of $60 million.[24] The TeamHealth policy was renewed on June 1, 2018 with the same $60 million in excess coverage and an increased $85 million aggregated retention.[25]

By the end of 2017, TeamHealth claims were increasing.[26] During a November 11, 2017 Board of Directors meeting, ProAssurance's then-Chief Executive Officer W. Stancil Starnes reported that the Company was competing in "soft and complex" market conditions.[27] He explained that "management expect[ed]

---

[22] Defs.' Opening Br. Ex. 6 (Aug. 3, 2016 Form 8-K) at 4; *see* Compl. ¶¶ 64-65. The Complaint notes that TeamHealth was not identified by name in the announcement. Compl. ¶ 64; *see also id.* ¶ 69 (discussing larger accounts on a 2018 earnings call as "add[ing] a good bit of exposure [and] . . . increas[ing] the[] potential for loss severity, in part due to the fact that there are higher policy limits available"). The defendants do not dispute that the referenced account was to TeamHealth. *See* Defs.' Opening Br. in Supp. of Mot. to Dismiss the Verified S'holder Deriv. Consol. Compl. and, Alternatively, to Stay the Action (Dkt. 17) ("Defs.' Opening Br.") 14-15.

[23] Compl. ¶¶ 2, 8, 64.

[24] *See* Defs.' Opening Br. Ex. 7 (Jan. 20, 2020 Audit Committee materials) at '568.

[25] *Id.*

[26] Compl. ¶ 88 tbl.1 (discussing TeamHealth claims).

[27] *Id.* ¶ 100.

that reserve development w[ould] be less favorable in the near to medium term than it ha[d] been in the past."[28]

On February 21, 2018, the Company's 2017 Form 10-K was filed. The filing stated that the Company had "sustained [its] financial stability during difficult market conditions through responsible underwriting, pricing and loss reserving practices and through conservative investment practices."[29]

## C. Loss Severity Monitoring in Early 2018

The Company worked with an independent actuary, Willis Towers Watson ("WTW"), to analyze the adequacy of ProAssurance's loss reserves.[30] Until early 2018, TeamHealth's risk severity was evaluated in conjunction with other HCPL policies.[31] By February 2018, WTW was analyzing the adequacy of reserves for the TeamHealth account separately.[32] The Company's external auditor, Ernst & Young LLP ("E&Y"), performed a similar analysis.[33]

---

[28] *Id.*

[29] *Id.* ¶ 51 n.5.

[30] *See id.* ¶ 97. WTW is a risk management, insurance brokerage, and advisory company.

[31] *Id.* ¶¶ 80, 101.

[32] Defs.' Opening Br. Ex. 4 at '582.

[33] *Id.*

The Company's Audit Committee met on February 19, 2018 and was updated on the performance of ProAssurance's large account business.[34] By this time, ProAssurance had created new "subgroups for analysis purposes."[35] WTW representatives reported to the Audit Committee on their actuarial review of the SP&C segment.[36] WTW's state-by-state review of medical professional liability was presented, which showed that "[f]requency ha[d] been flat overall, and severity [wa]s projected to increase moderately over time."[37]

A memorandum prepared by Friedman in advance of the meeting stated that although the risks associated with larger healthcare accounts were "somewhat different than [ProAssurance's] historical base," management believed it was "important to have a presence in this emerging area of healthcare."[38] He explained that "[f]requency remained flat" but "severity increased somewhat."[39]

The Company accounted for the "risk profile" of this type by "book[ing] higher initial loss ratios compared to [the Company's] traditional business."[40]

---

[34] Compl. ¶ 71. The meeting was attended by Audit Committee members Samuel A. Di Piazza, Bruce D. Angiolillo, and Frank A. Spinosa as well as Starnes, Edward L. Rand, and Freidman. *Id.*

[35] *Id.* ¶ 101.

[36] *Id.* ¶ 233.

[37] *Id.*

[38] *Id.* ¶ 71; Defs.' Opening Br. Ex. 9 (Feb. 19, 2018 Audit Committee materials) at '141.

[39] Compl. ¶ 102.

[40] Defs.' Opening Br. Ex. 9 at '142.

Friedman felt that WTW's loss estimates were "conservative" and told the Audit Committee that they had been "moderated" by management.[41] Despite that, both WTW and EY still considered the Company's reserves "reasonable."[42]

The full Board met on March 7, 2018 and discussed the Company's financial results for the fourth quarter of 2017.[43] Management reported that the "loss ratio increased in the quarter, driven largely by increased severity in the healthcare professional liability line."[44] The Board discussed trends "observed with respect to loss frequency and severity, and the reasonableness of the Company's carried reserves."[45] Directors were given a 2018 financial forecast predicting that "the loss ratio [wa]s expected to increase" and reports on the Company's reserves as analyzed

---

[41] *Id.*; *see* Compl. ¶ 138. Friedman's memorandum is dated "February 14, 2017" though it was presented at the February 19, 2018 meeting. The plaintiffs believe this was a typographical error. *See* Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. and, Alternatively, to Stay the Action (Dkt. 29) ("Pls.' Answering Br.") at 10 n.2.

[42] Defs.' Opening Br. Ex. 4 at '582-83.

[43] Compl. ¶ 104.

[44] *Id.*; Defs.' Opening Br. Ex. 8 (Mar. 7, 2018 Board minutes) at '442.

[45] Compl. ¶ 104.

by WTW.[46] Management analyzed the adequacy of the Company's carried reserves "in light of [the] ranges established by" WTW and EY's external reviews.[47]

Also on March 7, the Company's management-level Reserve Review Committee met.[48] During the meeting, the Reserve Review Committee observed "higher case reserves."[49] ProAssurance was "monitoring, evaluating, and reacting to the observed trends (likely) with less favorable development and higher accident year loss ratios."[50] Friedman informed the Reserve Review Committee that the Company was "seeing losses come in higher than the initial loss pick" for some larger accounts.[51]

On May 1, the Audit Committee met to discuss financial results for the first quarter of 2018.[52] The Audit Committee noted that earnings were below

---

[46] *Id.*; *see also* Defs.' Opening Br. Ex. 8 at '445. Board members present for the meeting included Starnes, Angiolillo, Di Piazza, Robert E. Flowers, M. James Gorrie, Ziad R. Haydar, Spinosa, Thomas A. S. Wilson Jr., and Katisha T. Vance. Friedman, Rand, and Michael L. Boguski (President, Specialty P&C segment) were also present.

[47] Defs.' Opening Br. Ex. 8 at '445.

[48] Compl. ¶ 105.

[49] *Id.* ¶¶ 105-06; Defs.' Opening Br. Ex. 28 (Mar. 7, 2018 Reserve Review Committee minutes) at '647.

[50] Defs.' Opening Br. Ex. 28 at '647.

[51] Compl. ¶ 106.

[52] Attendees included Audit Committee members Di Piazza, Angiolillo, and Spinosa, as well as Rand and Friedman. Compl. ¶ 109; Defs.' Opening Br. Ex. 38 (May 1, 2018 Audit Committee minutes).

expectations by -9.1%.[53]  The SP&C lines were underperforming at about $4 million below plan, "driven by loss severity on large account and excess and surplus business lines."[54]  When the Audit Committee members next met again on May 22, they "emphasized the importance of continued transparency in the Company's financial disclosures and asked management to be especially attentive to addressing investors' questions and concerns in future filings as the HCPL cycle develop[ed]."[55]

The full Board met on May 23, 2018 and discussed the Company's first quarter financial results.[56]  A memorandum from Friedman sent in advance of the meeting expressed that though "overall results for the medical professional liability industry continued to be quite good in 2017," there were "some signs of stress" beneath reported results.[57]  Then-Chief Operating Officer and Chief Financial Officer Edward L. Rand reported that "[t]he loss environment continue[d] to be a

---

[53] Compl. ¶ 109.

[54] *Id.*; Defs.' Opening Br. Ex. 38 at '587.

[55] Defs.' Opening Br. Ex. 25 (May 22, 2018 Audit Committee minutes) at '624; *see* Compl. ¶ 129.  Attendees included Audit Committee members Di Piazza, Angelillo, Spinosa, and Starnes as well as Rand and Friedman.  During the meeting, the Audit Committee discussed and reviewed minutes from three Reserve Review Committee meetings.  Compl. ¶ 129.

[56] Members present included Starnes, Adkins, Angiolillo, Di Piazza, Flowers, Gorrie, Haydar, John J. McMahon, Jr., Spinosa, Wilson, and Vance.  Friedman, Rand, and Boguski were also present.  *Id.* ¶ 110.

[57] *Id.* ¶ 113; Defs.' Reply Br. Ex. 41 (May 23, 2018 Board materials) at '743; *see also* Defs.' Opening Br. Ex. 21 (May 23, 2018 Board minutes) at '452.

challenge and with continued signs of increasing severity in HCPL especially, but not exclusively, with larger more complex risks."[58]

### D. Loss Reserves in 2018

The Audit Committee met on August 2, 2018 to discuss loss reserves in the second quarter of the year.[59] A memorandum from Friedman explained to the Audit Committee that WTW had taken "an even more pessimistic view on the TeamHealth account" based on its actuarial analysis of claims.[60] Friedman "expect[ed] that WTW [wa]s building a degree of caution into their development factors" and found WTW's "pessimistic view on the TeamHealth account" to be "debatable."[61] The Company had observed "higher claim severity" over the prior six months, "particularly with respect to some of [its] large-account and excess and surplus lines business."[62] At the same time, management reported that "frequency for the quarter was essentially flat" and that "industry indications of potential severity trend increases [were] of some concern," WTW "agree[d] with [management] that there [was no] evidence of an increase in paid severity in [the Company's] data."[63]

---

[58] Compl. ¶¶ 110, 133, 232; Defs.' Opening Br. Ex. 21 at '450-51.

[59] Compl. ¶ 116.

[60] *Id.*; Defs.' Opening Br. Ex. 16 (Aug. 2, 2018 Audit Committee materials) at '004, '006.

[61] Compl. ¶ 117.

[62] *Id.* ¶ 116.

[63] Defs.' Opening Br. Ex. 16 at '004, '006.

When the Audit Committee met again on October 31, Friedman gave an update on the reserves for "a particular large account."[64] The Audit Committee was advised that "increasing [claims] severity [wa]s concerning, but still [wa]s not showing in the Company's paid losses."[65] As explained in a memorandum provided before the meeting, Friedman continued to view WTW's "pessimistic" actuarial assessment of the TeamHealth account as "debatable."[66] Friedman told the Audit Committee that although "case reserves [we]re relatively high," he "believe[d] that those reserves [we]re conservative."[67]

The full Board met on November 28, 2018.[68] As part of the meeting materials, the Board received a memorandum from Rand about the Company's expectations for 2019.[69] Rand wrote that management "anticipate[d] that the severity trends in HCPL w[ould] continue into 2019."[70] Management's plan for the HCPL line "reflect[ed] continued higher current accident year loss costs and a decreasing level

---

[64] Compl. ¶ 123; Defs.' Opening Br. Ex. 39 (Oct. 31, 2018 Audit Committee minutes) at '590. The attendees in this meeting including Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa. Rand, Hendricks, and Friedman also attended.

[65] Defs.' Opening Br. Ex. 39 at '590.

[66] Compl. ¶ 122; Pls.' Answering Br. Ex. A (Oct. 24, 2018 Friedman memo) at '271.

[67] Pls.' Answering Br. Ex. A (Oct. 24, 2018 Friedman memo) at '271.

[68] Compl. ¶ 127.

[69] *Id.* ¶ 125; Defs.' Opening Br. Ex. 19 (Nov. 28, 2018 Board materials) at '545.

[70] Compl. ¶ 125; Defs.' Opening Br. Ex. 19 at '546.

of favorable reserve development."[71] The Audit Committee received similar news from the Company's internal audit department on November 27.[72]

### E.    Risk Assessment for 2019

On February 14, 2019, Friedman authored a memorandum addressing WTW's higher loss estimates due to a case reserve increase.[73] Friedman noted that WTW's more conservative estimates were "warranted to an extent," but had been "moderated to some degree" in management's final selection.[74] Specifically, ProAssurance recorded $61 million in case loss reserves instead of the $65 million estimated by WTW.[75]

Friedman's memorandum was shared with the Audit Committee in advance of its February 18 meeting.[76] At the meeting, Friedman explained that the "two greatest factors driving change in the healthcare professional liability reserves [we]re

---

[71] Compl. ¶ 125; Defs.' Opening Br. Ex. 19 at '546.

[72] Compl. ¶ 126 ("All lines of business noted an increase in frequency and severity of claims. We are seeing a rise in jury awards, which in turn leads to an increased frequency. This is something we as an organization are keenly aware of and are monitoring closely.").

[73] Compl. ¶ 136; Defs.' Opening Br. Ex. 5 (Feb. 18, 2019 Audit Committee materials) at '751.

[74] Compl. ¶¶ 136, 138; Defs.' Opening Br. Ex. 5 at '754.

[75] Compl. ¶¶ 136, 138; Defs.' Opening Br. Ex. 5 at '755.

[76] Compl. ¶ 137. Present for the meeting were Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa. Starnes, Rand, Hendricks, and Friedman were also present. Defs.' Opening Br. Ex. 11 (Feb. 18, 2019 Audit Committee minutes) at '592.

increased loss activity for larger accounts and greater severity in the case reserves."[77] He noted "in particular that case reserves on the large TeamHealth account [we]re high relative to actual loss payments, and the company [wa]s adjusting pricing and terms on that account and large accounts in general."[78]

Days later, on February 21, the Company announced that Friedman would be "retiring" from his role as President of Healthcare Professional Liability.[79]

Also on February 21, ProAssurance filed its 2018 Form 10-K.[80] The Company continued to attest to the conservative nature of its loss reserves practices.[81] As in prior years, ProAssurance disclosed that it had "sustained [its] financial stability during difficult market conditions through responsible underwriting, pricing and loss reserving practices and through conservative investment practices."[82] It also explained that the Company had "observed potentially higher severity trends in [its] case reserve estimates," but that those trends had "not been confirmed by actual claim payments."[83]

---

[77] Compl. ¶ 137; Defs.' Opening Br. Ex. 11 at '594.

[78] Compl. ¶ 137; Defs.' Opening Br. Ex. 11 at '594.

[79] Compl. ¶¶ 63, 139. Friedman maintained his employment at the company, "overseeing the continued development of the actuarial function." *Id.* ¶ 139.

[80] Compl. ¶ 140; Defs.' Opening Br. Ex. 2.

[81] Compl. ¶ 140; *see supra* note 29 and accompanying text (quoting 2017 Form 10-K).

[82] Compl. ¶ 229; Defs.' Opening Br. Ex. 2 at 37.

[83] Defs.' Opening Br. Ex. 2 at 38.

## F. Increasing Severity in 2019

On April 24, 2019, the Audit Committee met to discuss the Company's results for the first quarter of 2019, which was a "material earnings miss."[84] The Audit Committee discussed that "[t]he macro environment in the HCPL line suggest[ed] that the Company should expect larger losses on claims presently in inventory and thus the need for higher reserves."[85]

The members also discussed "the subjective aspects of the judgments that management makes each quarter with respect to reserve development, and the timing of those judgments."[86] CEO Starnes expressed that the "entire medical liability industry" was experiencing "increasing severity."[87] He noted that ProAssurance "was not adding to its loss reserves and that the reserves continue[d] to be adequate but with less redundancy."[88]

The Audit Committee met again on April 29.[89] Before the meeting, the members received a memorandum from the Company's Chief Financial Officer

---

[84] Compl. ¶ 146; Defs.' Opening Br. Ex. 14 (Apr. 24, 2019 Audit Committee minutes) at '632. The meeting was attended by Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Starnes, Rand, Hendricks, and Friedman.

[85] Compl. ¶ 146; Defs.' Opening Br. Ex. 14 at '633.

[86] Defs.' Opening Br. Ex. 14 at '634.

[87] *Id.*

[88] *Id.*; Compl. ¶ 147.

[89] Compl. ¶¶ 73, 134; Defs.' Opening Br. Ex. 15 (Apr. 29, 2019 Audit Committee minutes). In attendance were Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Rand, Hendricks, and Friedman.

Dana S. Hendricks "observing potentially higher severity trends and . . . an increase in the severity of incurred losses associated with a number of the large and more complex risk [ProAssurance] insure[s]."[90] Hendricks observed that "[d]ue to the long tailed nature of th[e] business, it w[ould] be several years before [ProAssurance] ha[d] concrete information regarding the ultimate impact of these losses."[91]

During the meeting, the Audit Committee discussed whether the more "complex risks" of larger accounts "are fundamentally different from the smaller accounts that have historically comprised the majority of the Company's business . . . requir[ing] substantially different skills."[92] The Audit Committee also inquired about "the reserve analysis process."[93] Friedman explained to the Audit Committee that the process "necessarily requires subjective judgments" and that "management endeavors to take a cautious approach when potential changes in trends are detected."[94]

---

[90] Compl. ¶ 148; Pls.' Answering Br. Ex. A (Apr. 29, 2019 Audit Committee materials) at '577.

[91] Pls.' Answering Br. Ex. A (Apr. 29, 2019 Audit Committee materials) at '577.

[92] Compl ¶ 73; Defs.' Opening Br. Ex. 15 at '637.

[93] Defs.' Opening Br. Ex. 15 at '637.

[94] *Id.*

Another Audit Committee meeting was held on May 21.[95] The attendees reviewed EY's 2019 audit plan with a representative of EY.[96] The EY representative observed that "[a]reas of significant potential risk include[d] . . . evaluation of loss reserves."[97]

The full Board met the following day.[98] COO Rand—now a Board member—told the directors that "management intend[ed] to focus heavily on underwriting, risk selection, and pricing to improve results."[99] A memorandum from Rand sent in advance of the meeting said that the SP&C team would be "monitoring rate adequacy on new business with the discipline to walk away from business that does not meet the Company's underwriting standards and profit objectives."[100] The Audit Committee reported that "[e]arnings were substantially lower than analysts' estimates due primarily to materially lower favorable reserve development in the

[95] Compl. ¶ 135; Pls.' Answering Br. Ex. A (May 21, 2019 Audit Committee minutes) at '611. In attendance were Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, along with Starnes, Rand, Hendricks, and Boguski.

[96] Compl. ¶ 135; Pls.' Answering Br. Ex. A (May 21, 2019 Audit Committee minutes) at '612.

[97] Pls.' Answering Br. Ex. A (May 21, 2019 Audit Committee minutes) at '612.

[98] Compl. ¶ 152; Defs.' Opening Br. Ex. 24 (May 22, 2019 Board minutes) at '001.

[99] Compl. ¶ 152; Defs.' Opening Br. Ex. 24 at '001-002.

[100] Compl. ¶ 152; Defs.' Opening Br. Ex. 23 (May 22, 2019 Board materials) at '375.

healthcare professional liability line as well as a higher current accident year loss ratio."[101]

Also on May 22, ProAssurance announced that CEO Starnes was departing, effective July 1, 2019. He would be replaced by Rand.[102]

The Audit Committee met on August 1, to review the Company's financial results for the second quarter of 2019.[103] CFO Hendricks reported that operating income was "lower than the prior-year period but consistent with first quarter results and with management's expectations."[104] She observed that reserve development was more favorable "in the second quarter than in the first quarter."[105] Friedman noted that this favorable development was "small" and due partly to another quarter of increased severity—though it "still was not appearing in actual paid losses."[106]

A memorandum from Friedman prepared in advance of the Audit Committee meeting recommended a "reduction of prior year loss reserves . . . on both a gross

---

[101] Defs.' Opening Br. Ex. 24 at '004.

[102] Compl. ¶ 151.

[103] *Id.* ¶ 155; Pls.' Answering Br. Ex. A (Aug. 1, 2019 Audit Committee minutes) at '639. In attendance were Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Starnes, Hendricks, Boguski, and Friedman (whose title was now Actuarial).

[104] Pls.' Answering Br. Ex. A (Aug. 1, 2019 Audit Committee minutes) at '640.

[105] *Id.*

[106] *Id.*

and net basis."[107]  This recommendation was "based on the current annual estimate from WTW and the $7 million reduction that [ProAssurance] recorded in the first quarter, offset by conservatism due to potential additional deterioration."[108] Friedman believed WTW's recommendations were "excessive given [the Company's] results, achieved rate increase and observations."[109]

## G.     Increasing Claims in 2019

By the end of the third quarter of 2019, TeamHealth's outstanding claims tally netted an additional 90 claims, bringing the total number to 895.[110]

On October 30, the Audit Committee met to review and approve the financial statements for the third quarter of 2019.[111]  Hendricks stated that the company would report operating income "above the consensus estimate" that was an improvement over the prior two quarters' results.[112]  Friedman observed that the loss trends "continued as expected" in the quarter and said that the Company had made an

---

[107] Compl. ¶ 155; Defs.' Opening Br. Ex. 17 (Aug. 1, 2019 Audit Committee materials) at '353.

[108] Compl. ¶ 155; Defs.' Opening Br. Ex. 17 at '353.

[109] Compl. ¶ 150; Defs.' Opening Br. Ex. 17 at '352.

[110] Compl. ¶ 88 tbl.1 (reporting claims based on allegations in a federal securities action complaint).  It should be noted that the defendants dispute these figures and aver that the plaintiffs misunderstand what the figures mean.

[111] Defs.' Opening Br. Ex. 10 (Oct. 30, 2019 Audit Committee minutes) at '597.  The meeting was attended by Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Starnes, Hendricks, and Friedman.

[112] *Id.*

additional $5 million of reserves for the TeamHealth account.[113] WTW noted that the overall trend for the TeamHealth account was negative.[114]

The Audit Committee met again on December 9.[115] The attendees recognized that "development trends for large accounts, and particularly TeamHealth, ha[d] been negative, but it was becoming clearer that the magnitude of ultimate expected losses would be greater than originally expected."[116] Hendricks reported that a study from an independent actuary for TeamHealth received in the past week, as well as an ongoing study by WTW, had prompted this clarification.[117] Accordingly, management developed a "preliminary view" that "an adjustment of $30 million to $50 million" of reserve strengthening "might be necessary in the fourth quarter."[118] The Audit Committee cautioned that "timing for disclosure of any material adjustment to reserves must be carefully balanced to assure prompt disclosure of a material known fact but avoid premature disclosure of information that remained

---

[113] Compl. ¶ 250; Defs.' Opening Br. Ex. 10 at '598.

[114] Compl. ¶ 250; Defs.' Opening Br. Ex. 10 at '598.

[115] Compl. ¶ 166; Defs.' Opening Br. Ex. 30 (Dec. 9, 2019 Audit Committee minutes). The meeting was attended by Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Rand, Hendricks, and Boguski.

[116] Compl. ¶ 166; Defs.' Opening Br. Ex. 30 at '601.

[117] Defs.' Opening Br. Ex. 30 at '601.

[118] *Id.*

uncertain or incomplete, and management acknowledged the importance of such balance."[119]

### H. 2020 Loss Reserve Disclosures

On January 20, 2020, management prepared a presentation for the Audit Committee about the TeamHealth account.[120] It stated that TeamHealth "ha[d] exhibited extreme severity over very long periods of time."[121] The presentation gave a bullet-point summary of ProAssurance's underwriting performance with respect to the TeamHealth account, including: "[k]nowledge [i]nequality"; "[n]o incentive to control frequency"; "[n]o risk sharing upon aggregate breech [sic]"; "[a]ggregate exposure under appreciated"; "[r]ate guarantee late in soft market"; "[l]ack of underwriting discipline"; and "[s]everely underpriced over four year period."[122] According to the presentation, $77.8 million of $94.8 million the Company spent in reserve actions was driven by TeamHealth.[123] The presentation suggested additional underwriting controls and actions, including the formation of a "Large Account Review Committee."[124]

---

[119] Compl. ¶ 167; Defs.' Opening Br. Ex. 30 at '601.

[120] Defs.' Opening Br. Ex. 7 at '555.

[121] *Id.* at '564.

[122] *Id.* at '569-70.

[123] *Id.* at '558.

[124] *Id.* at '575-76.

Two days later, on January 22, ProAssurance publicly disclosed "a preliminary estimate of $37 million of adverse development" in prior year accident loss reserves "driven by a large national healthcare account written since 2016."[125]

On February 17, the Audit Committee met to review the Company's fourth quarter results for 2019.[126] The Audit Committee members were told that the SP&C segment recorded a significant loss in the fourth quarter and for the year "due to reserve strengthening, a change in the current accident year loss pick for HCPL, and other adjustments, which in total had a negative impact of approximately $95 million."[127]

On February 20, ProAssurance announced its results for the fourth quarter of 2019.[128] The disclosure described an "[a]dverse development of $51.5 million in prior accident year reserves" due to "the effects of the large national healthcare account."[129] The Company's Form 10-K for 2019, filed the same day, reiterated that

---

[125] Defs.' Opening Br. Ex. 32 (Jan. 22, 2020 Form 8-K) at 3; Compl. ¶ 176.

[126] Compl. ¶ 180; Pls.' Opening Br. Ex. A (Feb. 17, 2020 Audit Committee minutes) at '603. In attendance were Audit Committee members Di Piazza, Adkins, Angiolillo, and Spinosa, as well as Starnes, Rand, Hendricks, Boguski, and Friedman.

[127] Pls.' Opening Br. Ex. A (Feb. 17, 2020 Audit Committee minutes) at '606.

[128] Defs.' Opening Br. Ex. 33 (Feb. 20, 2020 Form 8-K).

[129] *Id.* at 4.

the Company was "committed to disciplined underwriting, pricing, and loss reserving practices . . . even during difficult market conditions."[130]

## I.    The Securities Action

On June 16, 2020, a federal securities action was filed in the United States District Court for the Northern District of Alabama (the "Securities Action").[131]  An amended complaint was filed on March 21, 2021.[132]  The federal plaintiffs alleged that the defendants made materially misleading statements and omissions regarding, among other things, the Company's loss reserves and "conservative" reserve practices.[133]

On December 10, 2021, the federal court granted in part the defendants' motion to dismiss the Securities Action.[134]  The court determined that the statements cited by the plaintiffs' "relayed opinions—*i.e.,* senior management's beliefs about the reserves."[135]  The court noted that "[a] small category of statements present[ed] an exception to this general finding" and pointed to statements by Friedman and

[130] Compl. ¶ 182.

[131] *Id.* ¶ 189.

[132] *See* Defs.' Opening Br. Ex. 35 (Complaint, *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, Case No. 2:20-cv-00856-AKK (N.D. Ala.)).

[133] *Id.* ¶¶ 25-26.

[134] *See generally Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189 (N.D. Ala. 2021).

[135] *Id.* at 1207.

another director "represent[ing] to investors that [ProAssurance] had not observed any changes in claims frequency in 2018 or 2019."[136] The court dismissed the claims in full against Starnes, Rand, and Hendricks, observing that "[a]t best, most of these allegations amount to claims that [ProAssurance] and its executives could have done a better job at estimating losses."[137]

The action has since settled.[138]

## J.     This Litigation

On January 12 and February 25, 2022, two purported stockholders of ProAssurance filed stockholder derivative complaints in this court.[139] The suits followed the production of books and records by ProAssurance pursuant to 8 *Del. C.* § 220. The actions were subsequently consolidated, and a Verified Stockholder Derivative Consolidated Complaint was filed on May 27, 2022.[140]

---

[136] *Id.* at 1208.

[137] *Id.* at 1224.

[138] *See* Dkt. 50. Pursuant to the terms of the settlement agreement, no defendant admits any liability and ProAssurance will cause to be paid $28,000,000 to fully resolve all claims against the defendants named in the Securities Action. *Id.* The settlement amount will be funded by ProAssurance's insurance carriers. *Id.*

[139] *See* Dkts. 1, 5.

[140] Dkt. 8.

The defendants moved to dismiss the Complaint and briefing was completed on February 6, 2023.[141] On June 6, 2023, I heard argument on the defendants' motion to dismiss.[142] The matter was taken under advisement at that time.

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand excusal and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[143] Because the plaintiffs have deprived the Board of its right to manage the Company's litigation asset by declining to make a demand, my analysis begins with demand futility. It ends there as well.

The plaintiffs assert that demand is futile because 11 of the 13 directors at issue face a substantial likelihood of liability. They contend that the Board both failed to oversee the TeamHealth policy and made false and misleading statements about ProAssurance's conservative underwriting and reserve practices. These claims are unsupported by the sort of particularized allegations required to plead demand futility.

---

[141] Dkts. 16, 29, 36. This matter was reassigned to me on February 26, 2023. Dkt. 40.

[142] Dkt. 51.

[143] The defendants also moved, in the alternative, to stay this action pending the resolution of the Securities Action. That aspect of their motion is moot. *See supra* note 138 and accompanying text.

Insurance underwriting is, by its very nature, uncertain and risky. Any reader who endured my tedious recitation of the facts could recognize that the Board was consistently—even painfully—involved in monitoring the Company's underwriting and reserves. The plaintiffs' belief that the Company's practices were not sufficiently conservative is a quibble with the Board's judgment. Their conflation of a bad business outcome with "bad faith on the part of the Board" necessarily fails.[144] So does their effort to hold the Board liable for disclosures about the Company's underwriting and loss reserve practices absent allegations of scienter.

## A.   The Demand Futility Standard

Court of Chancery Rule 23.1 requires that a stockholder who forgoes making a litigation demand plead "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[145] "This requirement is rooted in the 'basic principle of the Delaware General Corporation Law . . . that the directors, and not the stockholders, manage

---

[144] *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *11 (Del. Ch. June 26, 2015) (rejecting plaintiffs' efforts to "conflate concededly bad outcomes from the point of view of the Company with bad faith on the part of the Board"), *aff'd*, 133 A.3d 971 (Del. 2016) (TABLE).

[145] Ct. Ch. R. 23.1; *see Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.").

28

the business and affairs of the corporation.'"[146] "It is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[147]

"The court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice while conducting a Rule 23.1 analysis."[148] "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading."[149] Instead, "[w]hat the pleader must set forth are particularized factual statements that are essential to the claim."[150]

Evaluating a board's ability to consider a pre-suit demand requires consideration of the plaintiff's allegations on a "director-by-director" basis.[151] For each director, the court must apply a three-part test asking:

(i)    whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

---

[146] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021) (quoting *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009)), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

[147] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

[148] *Kraft Heinz*, 2021 WL 6012632, at *4 (citing *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001)).

[149] *Id.* (quoting *Brehm*, 746 A.2d at 254).

[150] *Id.*

[151] *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006).

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[152]

"If the answer to any of these three questions is 'yes' for at least half of the members of [a] demand board, then demand is excused as futile."[153]

## B. The Demand Futility Analysis

"The court 'counts heads' of the members of a board to determine whether a majority of its members are disinterested and independent for demand futility purposes."[154] As of January 12, 2022 when this litigation was first brought, the Board had 13 members: W. Stancil Starnes, Edward L. Rand, Jr., Samuel A. Di Piazza, Jr., M. James Gorrie, Bruce D. Angiolillo, Maye Head Frei, Katisha T. Vance, Frank A. Spinosa, Ziad R. Haydar, Thomas A.S. Wilson, Jr., Kedrick D.

---

[152] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[153] *Id.*

[154] *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021) (citing *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016), *aff'd*, 279 A.3d 356 (TABLE).

Adkins, Jr., Fabiola Cobarrubias, and Scott C. Syphax.[155]  I refer to these directors as the "Demand Board."

Two of the thirteen Demand Board members—Cobarrubias and Syphax—joined the Board in May 2021.  The plaintiffs do not challenge their independence or disinterestedness.[156]  Thus, I consider whether 7 of the remaining 11 Demand Board members would be incapable of impartially considering a pre-suit demand.

I end my analysis after concluding that the five Demand Board members who were neither on the Audit Committee nor participants at its meetings—Gorrie, Frei, Haydar, Vance, and Wilson—are disinterested and independent.  The plaintiffs do not allege that these directors received a material personal benefit from the matters raised on the Complaint.  Nor (other than Gorrie) do they challenge the directors' independence.[157]  Although allegations against all Demand Board members are feeble, there is a striking absence of particularized allegations suggesting that Gorrie, Frie, Haydar, Vance, or Wilson face a substantial likelihood of liability for a non-

---

[155] Compl. ¶¶ 22-23, 29, 31-38, 41-42.

[156] *See Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *14 (Del. Ch. Jan. 21, 2022) (noting that a plaintiff waived arguments about a director's independence by failing to brief them).

[157] *See infra* Section II.B.3.  The plaintiffs also allege that Rand could not impartially consider a demand due to his service on the Reserve Review Committee.  Compl. ¶ 265.  I need not consider these allegations.  My conclusion that demand is not futile as to a majority of the Demand Board is made exclusive of Rand.

exculpated claim.[158] In fact, other than describing the five directors' tenure, position, and compensation, the only factual allegations specific to each concern attendance at regular Board meetings and receipt of ordinary course meeting materials.

Together with Cobarrubias and Syphax, the five non-Audit Committee Demand Board members yield a majority. At least seven of the Demand Board members could have impartially considered a pre-suit demand. The Complaint must therefore be dismissed under Rule 23.1.

### 1. The Oversight Claim

An oversight claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[159] In *Stone v. Ritter*, the Delaware Supreme Court outlined the two "necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations . . . ."[160] These articulations of an oversight claim are "colloquially referred to as prongs one and two of *Caremark*."[161] "In either case, imposition of liability requires a showing that

---

[158] *See* 8 *Del. C.* § 102(b)(7); Defs.' Opening Br. Ex. 36 (ProAssurance certificate of incorporation) § VIII.

[159] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[160] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (citation omitted).

[161] *Constr. Indus. Laborers Pension Fund ex rel. SolarWinds Corp. v. Bingle*, 2022 WL 4102492, at *6 (Del. Ch. Sept. 6, 2022), *aff'd*, 297 A.3d 1083 (Del. 2023) (TABLE).

the directors knew that they were not discharging their fiduciary obligations"—that is, that they acted in bad faith.[162]

Initially, the plaintiffs' theory of oversight liability seemed to be premised on the first *Caremark* prong. The plaintiffs alleged that a majority of the Demand Board members face a substantial likelihood of liability for "fail[ing] to implement adequate controls and procedures to mitigate ProAssurance's liability."[163] The plaintiffs also pleaded that "[g]iven the 'mission critical' importance of underwriting to ProAssurance's overall business . . . the Board's failure to implement adequate controls and procedures for underwriting these policies could not have been in good faith."[164] The parties' briefs similarly argued about whether the Demand Board implemented adequate underwriting controls.[165]

---

[162] *Stone*, 911 A.2d at 370 (citation omitted).

[163] Compl. ¶ 224; *see also id.* ¶ 226 ("[T]he Demand Defendants failed to implement the requisite controls to ensure the underwriting and policy terms for large healthcare accounts were adequately supported.").

[164] *Id.* ¶ 227; *see also id.* ¶ 228 ("[T]he Demand Defendants were reckless in failing to implement controls such that 'unique' policies would receive particular scrutiny for the associated risks before they were approved.").

[165] *See* Defs.' Opening Br. 32-38 ("Plaintiffs' theory of liability . . . is premised on the first *Caremark* prong, i.e., that the Demand Defendants 'utterly failed to implement adequate controls and procedures' to address the risks associated with the underwriting of large accounts[.]"); Pls.' Answering Br. 44-45 ("Before the TeamHealth policy was issued in 2016, a majority of the Demand Defendants created a management-level [National Health Team] tasked with issuing HCPL policies to large physician groups, yet failed to implement controls and procedures serving as parameters to assess and price the corresponding risks for these policies."); Defs.' Reply Br. 7 ("Plaintiffs do not dispute that they are proceeding under the first *Caremark* prong in arguing that a majority of the

At oral argument, the plaintiffs took a different approach. The plaintiffs insisted that they were challenging the Demand Board's alleged failure to respond to red flags—i.e., the second *Caremark* prong.[166] Their new theory is that the directors engaged in bad faith by ignoring risks associated with the TeamHealth policy.[167]

The plaintiffs were wise to abdicate their claim that the Board failed to adequately oversee underwriting and loss reserves. Far from "utterly fail[ing] to implement any reporting or information system or controls,"[168] ProAssurance's Board was doing its job. The Complaint details the engagement of auditors and actuarial advisors, oversight of management charged with the Company's underwriting functions, meetings to discuss severity trends and reserves, and Board-level updates on large accounts.[169]

---

Demand Board faces a substantial likelihood of liability for failing to oversee the underwriting of large accounts.").

[166] *See* Trans. of June 6, 2023 Oral Arg. on Defs.' Mot. to Dismiss the Verified S'holder Deriv. Consol. Compl. and, Alternatively, to Stay the Action (Dkt. 51) ("Hr'g Tr.") 55.

[167] *See* Hr'g Tr. 56-58.

[168] *Stone*, 911 A.2d at 370 (citation omitted).

[169] *See supra* notes 30, 33-34, 36, 43, 45 and accompanying text. The plaintiffs' briefing asserts that a majority of the Demand Board members "created a management-level NHT" but "failed to implement controls and procedures" related to its operations. Pls.' Opp. Br. 44. There are, however, no allegations in the Complaint about the Board's "involvement" in creating the NHT. *See Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 255 n.45 (Del. 2019).

The plaintiffs' recast oversight claim is equally weak. The plaintiffs must plead that the directors knew "the corporation was violating the law" and "acted in bad faith by failing to prevent or remedy those violations."[170] To do so, a plaintiff typically alleges specific facts supporting a reasonable inference that the directors knew of "violations of positive law" or "that the board consciously failed to act after learning about evidence of illegality."[171] The Complaint lacks any such allegations.

First, the plaintiffs acknowledge that there is no indication ProAssurance's actions were illegal.[172] Modern boards are under increasing pressure from constituents to monitor diverse risks.[173] Still, "Delaware courts have not broadened a board's *Caremark* duties to include monitoring risk in the context of business decisions."[174] And for good reason.

---

[170] *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (citing *Caremark*, 698 A.2d at 971).

[171] *South ex rel. Hecla Mining Co. v. Baker*, 62 A.3d 1, 15 (Del. 2012).

[172] *See* Hr'g Tr. 58 (The Court: "Are you saying that this was something illegal that they were doing, or just a business decision that didn't turn out well?" Plaintiffs' Counsel: "No, we don't say that the company was countenancing illegality here.").

[173] *See e.g.*, *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, 2021 WL 459777, at *11-12 (Del. Ch. Oct. 5, 2021) (observing that "corporate governance must evolve" as "legal and regulatory frameworks" do); *SolarWinds*, 2022 WL 4102492, at *1 (describing cybersecurity as a risk "essential to the business" of companies).

[174] *Marriott*, 2021 WL 4593777, at *12; *see also SolarWinds*, 2022 WL 4102492, at *7 ("Many Delaware cases have cautioned that whether *Caremark* should be applied to business risk remains an open question.") (citation omitted); *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *12 (Del. Ch. Oct. 1, 2019) ("[A]s relates to *Caremark* liability, it is appropriate to distinguish the board's oversight of the company's management of business risk that is inherent in its business plan from the board's oversight of the company's compliance with positive law— including regulatory mandates."); *In re*

35

Evaluating business risk is "the quintessential board function."[175]  So long as the challenged conduct is lawful, directors have broad discretion to advance the corporation's interests as they see fit.  The directors' responsibility to oversee fundamental risks "does not eviscerate the core protections of the business judgment rule," which allow them "to pursue risky transactions without the specter of being held personally liable if those decisions turn out poorly."[176]

A decision to break the law is a different matter.  Although Delaware corporations may innovate on the edges of commercial uncertainty, they must meet a baseline of legality.  Business risks are shades of gray; legal compliance risks are black and white.  Directors lack the discretion "to consciously cause the corporation to act unlawfully."[177]

---

*Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *21 (Del. Ch. Oct. 12, 2011) ("[T]his Court has not definitively stated whether a board's *Caremark* duties include a duty to monitor business risk.").

[175] *SolarWinds*, 2022 WL 4102492, at *1.

[176] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("To the extent the Court allows shareholder plaintiffs to succeed on a theory that a director is liable for a failure to monitor business risk, the Court risks undermining the well settled policy of Delaware law by inviting courts to perform a hindsight evaluation of the reasonableness or prudence of directors' business decisions."); *see also Ont. Provincial Council of Carpenters' Pension Tr. Fund ex rel. Walmart Inc. v. Walton*, 2023 WL 3093500, at *33 (Del. Ch. Apr. 26, 2023) ("When directors make a business decision that carries legal risk, but which otherwise involves legally compliant conduct, then the business judgment rule protects that decision."); *SolarWinds*, 2022 WL 4102492, at *1 ("[A]bsent statutory or regulatory obligations, how much effort to expend to prevent [risks] against the corporate interest requires an evaluation of business risk, the quintessential board function.").

[177] *Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007) (citation omitted); *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del.

Here, venturing into uncertain territory by underwriting large accounts is a classic business decision. The plaintiffs complain that the Company, though inexperienced in underwriting large policies, rejected its actuary's recommendations to take more conservative loss reserves.[178] None of these facts suggest that ProAssurance was running afoul of regulatory or legal requirements.[179] "Legal, if risky, actions that are within management's discretion to pursue are not 'red flags' that would put a board on notice" of improper conduct.[180] The absence of red flags of illegality stands in stark contrast to the precedent cited by the plaintiffs.[181]

Ch. 2004) ("[A] fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."); *In re Massey Energy Co. Deriv. & Class Action Litig.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.") (citation omitted).

[178] *E.g.*, Compl. ¶¶ 71-72, 86, 97-98, 104-06, 108, 125-27.

[179] *See, e.g.*, *Reiter ex rel. Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *2-4, 13 (Del. Ch. Oct. 18, 2016) (dismissing a *Caremark* claim where the company risked becoming "the [s]ubject of [r]egulatory [i]nvestigations" regarding "anti-money laundering laws and regulations" but none of the purported red flags stated that the company "had been found to violate statutory requirements" or that anyone "had engaged in fraudulent or criminal conduct"); *Marriott*, 2021 WL 47593777, at *15 (rejecting an oversight claim where the plaintiffs failed to "allege that the directors were told, for example, that Starwood's standards ran afoul of regulatory or legal requirements"); *Rojas ex rel. J C. Penney Co., Inc. v. Ellison*, 2019 WL 3408812, at *14 (Del. Ch. July 29, 2019) (emphasizing, in the context of ongoing price-comparison claims and a consumer lawsuit, "the lack of any particularized factual allegations to support a reasonable inference that the members of the Demand Board knew or should have known that the Company was violating the law at any time before (or after) those actions were filed").

[180] *Goldman Sachs*, 2011 WL 4826104, at *20.

[181] *See* Pls.' Opp. Br. 47; *Kandell ex rel. FXCM, Inc. v. Niv*, 2017 WL 4334149, at *18 (Del. Ch. Sept. 29, 2017) (noting the case's "highly unusual set of facts: a Delaware corporation with a business model allegedly reliant on a clear violation of a federal

But even if one could envision "an extreme hypothetical" where the failure to monitor business risk could yield director oversight liability, a showing of bad faith would be a prerequisite.[182] The plaintiffs would be required to plead facts showing a "sustained or systemic failure" of oversight.[183] Nothing of the sort is alleged here.

The decision to underwrite the TeamHealth account does not suggest bad faith. It would be unreasonable to infer that the account's future risks were apparent to the Board at the time of underwriting, when ProAssurance had just entered the large account space.[184] Understanding that the TeamHealth policy had "unique" terms does not equate to knowledge of an imminent corporate trauma.[185] Moreover,

---

regulation; a situation of which I can reasonably infer the Board was aware"); *Shaev v. Baker*, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) (declining to dismiss a claim where the directors allegedly "failed to exercise reasonable oversight over pervasive fraudulent and criminal conduct") (citation omitted); *Walmart*, 2023 WL 3093550, at *30 (denying a motion to dismiss where the directors and officers allegedly ignored "a steady stream of red flags" that Walmart was not complying with the Controlled Substances Act and a settlement with a federal agency).

[182] *SolarWinds*, 2022 WL 4102492, at *7 ("While no case in this jurisdiction has imposed oversight liability based solely on failure to monitor business risk, it is possible, I think, to envision an extreme hypothetical involving liability for bad faith actions of directors leading to such liability.") (citation omitted).

[183] *Caremark*, 698 A.2d at 971.

[184] *See* Compl. ¶ 63. In addition, 4 of the 13 Demand Board members (Frei, Adkins, Vance, and Rand) joined the Board after the TeamHealth policy was issued. Two others (Cobarrubias and Syphax) are not named as defendants. And one more (Angiolillo) was elected to the Board shortly before the policy was issued.

[185] *See* Compl. ¶¶ 64, 86-87, 228; *see also Okla. Firefighters Pension & Ret. Sys. ex rel. Citigroup, Inc. v. Corbat*, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017) ("[T]he corporate trauma in question 'must be sufficiently similar to the misconduct implied by the "red flags" such that the board's bad faith, "conscious inaction" proximately caused that trauma'" (quoting *Qualcomm*, 2016 WL 4076369, at *8)); *Walmart*, 2023 WL 3093500, at

38

account underwriting was a management function overseen by professional underwriters. It was not the Board's duty to write (or even review) the policy or to second guess the underwriters.[186]

The plaintiffs' core allegation of bad faith seems to be that the Board knew Friedman and management booked less conservative loss reserves than WTW had recommended.[187] For example, the Audit Committee received a memorandum from Friedman before its February 19, 2018 meeting discussing management's decision to "moderate[]" WTW's loss estimates.[188] But it is hardly indicative of bad faith for experienced underwriters to decline to wholesale adopt actuarial recommendations. The same February 19 memorandum informed the Audit Committee that management "considered" the risk factors "and booked higher initial loss ratios as

---

*33 (noting that a "red flags claim" requires the plaintiff to plead "red flags that the corporate trauma was coming").

[186] *See Ash v. McCall*, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000) ("Directors of Delaware corporations quite properly delegate responsibility . . . in a host of circumstances.") (citing 8 Del. C. § 141(e)); *In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *17 (Del. Ch. Jan. 31, 2022) ("Proper oversight does not require that a board consider every corporate decision before it occurs.") (citation omitted), *aff'd*, 285 A.3d 1204 (Del. 2022) (TABLE).

[187] Hr'g Tr. at 58 ("I think the bad faith comes in, again, when, if you have an expert that you have hired and you are ignoring that expert, that is bad faith.").

[188] Compl. ¶ 99; *see* Defs.' Opp. Br. Ex. 9 at '142; *see also* Compl. ¶ 150; Defs.' Opening Br. Ex. 17 at '352-53.

compared to [the Company's] traditional business to reflect the risk profile and price competition."[189]

The Complaint recounts in painstaking detail how the Audit Committee and Board were regularly informed that larger accounts presented higher liability risks that management and the Company's advisors were monitoring them.[190] As another example, on May 23, 2018, the Board was told that "larger verdicts and increasing loss severity tends to affect larger . . . entities with bigger balance sheets and higher insurance coverage limits."[191] At the same meeting, however, management explained "the challenges ahead for [the HCPL] line and the various strategies and initiatives in place or planned to meet those challenges," providing reassurance on its plan to address them.[192] Unable to contest these facts, the plaintiffs repeatedly

---

[189] Defs.' Opening Br. Ex. 9 at '142.

[190] *E.g.*, Compl. ¶ 71 (discussing Feb. 19, 2018 Audit Committee meeting); *id.* ¶ 225; *see also id.* ¶ 78 (discussing Nov. 27, 2018 Audit Committee meeting); ¶¶ 79-80; ¶ 101 (discussing Feb. 19, 2018 Audit Committee meeting); ¶ 109 (discussing May 1, 2018 Audit Committee meeting); ¶ 116 (discussing Aug. 2, 2018 Audit Committee meeting); ¶ 104 (discussing Mar. 7, 2018 Board meeting); ¶¶ 111, 133 (discussing May 23, 2018 Board meeting); ¶¶ 122-23 (discussing Oct. 31, 2018 Audit Committee meeting); ¶ 127 (discussing Nov. 28, 2018 Board meeting); ¶ 129 (discussing May 22, 2018 Audit Committee meeting); ¶ 130 (discussing Feb. 19, 2018 Audit Committee meeting); ¶ 137 (discussing Feb. 18, 2019 Audit Committee meeting); ¶¶ 146-47 (discussing Apr. 24, 2019 Audit Committee meeting); ¶ 155 (discussing Aug. 1, 2019 Audit Committee meeting); ¶ 164 (discussing Oct. 30, 2019 Audit Committee meeting); ¶ 166 (discussing Dec. 9, 2019 Audit Committee meeting); ¶ 171 (discussing Jan. 20, 2020 Audit Committee meeting); ¶ 180 (discussing Feb. 17, 2020 Audit Committee meeting).

[191] *Id.* ¶ 72.

[192] Defs.' Opening Br. Ex. 21 at '452.

allege that the Board should have caused the Company to be more conservative in its underwriting and loss reserve practices. This hindsight second-guessing of a business decision that turned out poorly cannot reasonably support an inference of bad faith.[193]

Given these shortcomings, the plaintiffs have failed to demonstrate that any of the Demand Board members—much less a majority—face a substantial likelihood of liability on a *Caremark* claim.

### 2. The Disclosure Claims

Next, the plaintiffs argue that demand is excused because a majority of the Demand Board faces a substantial likelihood of liability for non-exculpated disclosure violations. The plaintiffs point to two categories of purported misrepresentations.[194] They challenge disclosures in ProAssurance's Form 10-Ks describing the Company's underwriting and reserve practices as "conservative" and

---

[193] *Zimmer Biomet*, 2021 WL 3779155, at *11, *22 n.260 (explaining that the plaintiffs' "second-guessing" of imperfect "remediation efforts" "cannot form the basis of a *Caremark* claim"); *Fisher ex rel. LendingClub Corp. v. Sanborn*, 2021 WL 1197577, at *16 (Del. Ch. Mar. 30, 2021) (rejecting a *Caremark* claim where a "Risk Committee was made aware on a regular basis of trends . . . and steps the Company had taken to address those trends when necessary").

[194] The plaintiffs also repeatedly critique statements by management during earnings calls. *E.g.*, Compl. ¶¶ 52, 65, 94. There are no allegations that a majority of the Demand Board members were involved in—or aware of—these specific statements before they were made.

"disciplined."[195]   And relatedly, they accuse the Board of failing to disclose the alleged frequency and severity trends affecting the TeamHealth account.[196]

"Corporate fiduciaries can breach their duty of disclosure under Delaware law in a number [of] ways—by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[197] Where the challenged disclosures do not call for stockholder action, "a plaintiff must allege that the directors 'deliberately misinform[ed] shareholders about the business of the corporation.'"[198]   To show a substantial likelihood of liability on such a claim the plaintiffs "must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly or intentionally.'"[199]   The Complaint is devoid of any particularized allegations of scienter regarding ProAssurance's disclosures.

---

[195] *Id.* ¶¶ 229-30.

[196] *Id.* ¶ 254.

[197] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999) (citation omitted).

[198] *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *13 (Del. Ch. Sept. 30, 2020); *see Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998).

[199] *Citigroup*, 964 A.2d at 132 (quoting *Transworld*, 745 A.2d at 915).

### a. Disclosures About Conservativism

The plaintiffs allege that the Demand Board made "knowingly false and misleading statements" in the Company's 2017, 2018, and 2019 Form 10-Ks.[200] These statements include that ProAssurance: maintains "responsible underwriting, pricing and loss reserving practices and through conservative investment practices"; is "committed to disciplined underwriting, pricing and loss reserving practices"; and has "reasonable and appropriate" reserves.[201] The Complaint does not support a reasonable conclusion that a majority of the Demand Board is substantially likely to be liable for these statements.[202]

First, the Complaint lacks specific factual allegations reasonably suggesting "sufficient board involvement" in preparing the disclosures.[203] The only director involvement alleged is signing the SEC filings.[204] "A statement that the documents were signed by the [directors], or that they 'approved' the disclosures and 'caused'

---

[200] *See* Hr'g Tr. 36-37 (clarifying the Form 10-Ks at issue).

[201] Compl. ¶¶ 229-30, 246.

[202] The plaintiffs argue that the partial denial of a motion to dismiss in the Securities Action should bear on my analysis. Pls.' Opp. Br. 34-35. The court in the Securities Action denied a motion to dismiss pertaining to ProAssurance's public statements about its "conservative," "disciplined," "cautious" practices given the "unique TeamHealth deal." Compl. ¶ 192 (quoting *ProAssurance Corp.*, 600 F. Supp 3d at 1217). But none of the Demand Board members, other than Starnes and Rand, were named as defendants in the Securities Action and those two were named under a control person (not scienter) theory.

[203] *Citigroup*, 964 A.2d at 134.

[204] Compl. ¶ 51 n.5 (alleging that the directors "signed" the Form 10-Ks); *id.* ¶¶ 53, 140, 182.

43

or 'consented to' their filing, is not—without more—a particularized allegation of fact."[205]

Second, the Complaint lacks sufficient allegations of scienter. The plaintiffs have not alleged with specificity that the directors "had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves."[206] In fact, the Complaint says nothing about a single individual director acting "deliberately" or having a particular "state of mind" in issuing the disclosures.[207]

The plaintiffs' allegations center on the Audit Committee members, who received information about WTW's "more pessimistic view" of TeamHealth.[208] Even then, the Complaint and Board materials demonstrate that the directors were

---

[205] *Zimmer Biomet*, 2021 WL 3779155, at *15 (citations omitted); *see also In re NantKwest, Inc. Deriv. Litig.*, 2018 WL 2303360, at *4 (Del. Ch. May 18, 2018). The plaintiffs cite to *In re infoUSA, Inc. Shareholders Litigation*, where the court inferred scienter on the part of directors who signed Form 10-Ks stating that payments to the CEO were made for "usage of aircraft and related services." 953 A.2d 963, 990 (Del. Ch. 2007) (describing that the directors issued the disclosure with knowledge that it was deceptive). But, in *infoUSA*, the directors allegedly knew that nearly $600,000 of the payments constituted compensation for personal expenses such as a yacht. *Id.* No similar allegations of scienter exist here.

[206] *Citigroup*, 964 A.2d at 134 (citation omitted).

[207] *Zimmer Biomet*, 2021 WL 3779155, at *12 (explaining that a determination of "whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants" that, at the pleading stage, is inferred based on allegations in the complaint) (citation omitted).

[208] *See* Pls.' Opp. Br. 36 (describing information shared only with the Audit Committee regarding WTW's "more pessimistic view" of TeamHealth as "underscor[ing] Board knowledge of the problematic account").

told the Company "moderated" WTW's approach.[209]  It would be unreasonable to take the inferential leap that the Audit Committee members knew disclosures about the Company's conservative practices were false because an advisor took a more cautious view of an account.  And even if it were not, just 6 of 13 Demand Board members would be implicated.  The Audit Committee's knowledge cannot be imputed to the rest of the Board.[210]

The plaintiffs' allegations regarding the five non-Audit Committee Demand Board members are based almost entirely on attendance at four Board meetings in 2017 and 2018 where industry trends and management's projections of less favorable results for the HCPL segment were discussed.[211]  None of these allegations about the overall industry support a rational inference that the directors made materially misleading statements about ProAssurance's business practices based on knowledge about adverse developments specific to TeamHealth.[212]  The plaintiffs fall back to group pleading that all Demand Board members "knew by at least the

[209] *E.g.*, Compl. ¶¶ 98-99, 117-18, 138.

[210] *See Desimone*, 924 A.2d at 943.  The fact that the Audit Committee gave regular updates to the full Board cannot be taken to mean that specific information was delivered.  Again, the plaintiffs rest on vague facts and unsupported inferences rather than particularized allegations.

[211] Compl. ¶¶ 233-34, 239.

[212] *See Citigroup*, 964 A.2d at 135 ("Merely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the director defendants knew that Citigroup's disclosures were false or misleading.").

second quarter of 2018 that ProAssurance's loss reserves for the TeamHealth account were massively understated."[213] This generalized allegation falls well short of the particularity standard.[214]

The only specific reference to TeamHealth that can be associated with the non-Audit Committee Demand Board members is that ProAssurance "enhanc[ed] [its] presence in the large broker world" by "writing accounts like TeamHealth."[215] Knowledge that TeamHealth was a large account coupled with vague allegations about large account trends does not yield a reasonable inference that the Demand Board knew statements about ProAssurance's conservatism were false. Simply put, the plaintiffs fail to show anything in the Board materials "that, fairly read, could be said to demonstrate knowledge of falsity"[216]—particularly on the part of the non-Audit Committee directors.

---

[213] Compl. ¶ 231.

[214] *See Raj & Sonal Abhyanker Fam. Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *4 (Del. Ch. June 17, 2021) (describing allegations asserted against "All Defendants" as "impermissible group pleading"); *see also In re Chemed Corp., S'holder Deriv. Litig.*, 2015 WL 9460118, at *11 (D. Del. Dec. 23, 2015) (recognizing that group pleading is an "indicator that the plaintiff's allegations are unlikely to be sufficiently particularized to meet" Rule 23.1's requirements)*, report and recommendation adopted sub nom. KBC Asset Mgmt. NV v. McNamara*, 2016 WL 2758256, at *1 (D. Del. May 12, 2016).

[215] Compl. ¶ 232.

[216] *Steinberg ex. rel. Hortonworks, Inc. v. Bearden*, 2018 WL 2434558, at *11 (Del. Ch. May 30, 2018) (concluding that allegations that directors "knew" the company's public disclosure was false because they heard a presentation on the subject were insufficient to plead demand futility).

Third, the directors cannot be said to have inadequately informed themselves about the disclosures' veracity in bad faith. Both the Complaint and Board materials it incorporates demonstrate that the directors were repeatedly advised by management and external advisors that ProAssurance's reserves were adequate and reasonable.[217] The directors were told, among other things, about the Company's "cautious" approach to emerging trends that threatened adverse reserve developments after the TeamHealth policy was signed.[218] There is no basis to infer that the directors' reliance on officers and experts was not in good faith.[219]

### b. Disclosures About Frequency and Severity Trends

Next, the plaintiffs contend that the Demand Board failed to disclose frequency (i.e., the number of claims being reported) and severity (i.e., the amount

---

[217] *See, e.g.*, Defs.' Opening Br. Ex. 4 at '583; Defs.' Opening Br. Ex. 5 at '693; Defs.' Opening Br. Ex. 11 at '593.

[218] Compl. ¶ 155; *see* Defs.' Opening Br. Ex. 12 (Sept. 4, 2019 Board minutes) at '0013 (management updating the Board on "the challenges and underperformance of large accounts" while reiterating that it "continue[d] to take a cautious view" and "remain[ed] focused on underwriting discipline and operational efficiency"); Defs.' Opening Br. Ex. 13 (Sept. 4, 2019 Board minutes) at '349 ("The increase in the loss ratio is attributable to our continued caution around increases in severity observed in the [HCPL] market."); Defs.' Opening Br. Ex. 19 at '523 ("[W]e continue to react cautiously to signs that the loss environment in the HCPL market is worsening."); Defs.' Opening Br. Ex. 22 (Sept. 5, 2018 Board materials) at '579; *see also Genworth Fin., Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *18 (Del. Ch. Sept. 29, 2021) (observing that "unqualified audit opinions . . . coupled with management's constant assurances to the Board that . . . reserves were being adequately addressed, absolve the Board of liability under 8 *Del. C.* § 141(e) as a matter of law").

[219] 8 *Del. C.* § 141(e).

47

of liability per claim) trends affecting the TeamHealth account.[220] The plaintiffs allege that the certain directors—Audit Committee members or Audit Committee meeting participants—"specifically knew" yet failed to disclose that ProAssurance "would incur higher than expected losses for the TeamHealth account."[221] They assert that the remaining Demand Board members "knew, or recklessly failed to know, of the deteriorating TeamHealth account."[222]

This claim suffers from many of the same deficiencies as those addressed above.[223] There are no particularized allegations allowing me to reasonably infer that the directors issued materially misleading disclosures with scienter. Further, the plaintiffs' allegations about severity and frequency trends are contradicted by Board materials reflecting that the Audit Committee and Board members were told overall frequency remained flat, and that severity (though increasing) was not showing up in ProAssurance's paid losses.[224]

---

[220] *See* Compl. ¶ 74.

[221] *Id.* ¶ 248.

[222] *Id.* The plaintiffs' efforts to seek liability on allegations of recklessness cannot support their demand futility arguments. *See Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *12 n.104 (Del. Ch. Feb. 12, 2009) ("[R]ecklessness by itself only amounts to gross negligence, which is not sufficient to demonstrate the state of mind necessary for finding a breach of the duty of loyalty."), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE).

[223] *See supra* Section II.B.1.a.

[224] *See, e.g.*, Defs.' Opening Br. Ex. 4 at '582 (report from WTW that "[f]requency has been flat overall, and severity is projected to increase moderately over time"); Defs.' Opening Br. Ex. 16 at '004 (noting that "frequency for the quarter was essentially flat").

The plaintiffs point to a few instances where the Audit Committee and directors attending Audit Committee meetings might have learned about problematic trends.[225] But there are no particularized allegations that the non-Audit Committee directors discussed TeamHealth—let alone frequency and severity trends associated with the account—at any Board meetings before the need for enhanced reserves became apparent.

Regarding frequency, the plaintiffs cite to allegations in the Securities Action complaint that TeamHealth's claims "increased in frequency" by almost 900% by the second quarter of 2018.[226] Even accepting the assertion as true, there are no allegations that the directors knew this information.[227] Moreover, the Complaint and Board materials it incorporates are replete with instances where the directors were advised that frequency trends were in line with historic levels.[228]

Regarding severity, the Audit Committee received regular updates about trends in the HCPL industry generally and their effects on ProAssurance's results and reserve assumptions.[229] These updates noted that increasing severity trends were

---

[225] *See* Compl. ¶¶ 88-89, 248-50.

[226] *Id.* ¶¶ 88-89, 248.

[227] *Id.* ¶ 6 (stating that "[m]anagement was aware of the claim frequency"); *see also id.* ¶ 93.

[228] *E.g., id.* ¶ 79; *see supra* note 224 (citing Board materials).

[229] *See, e.g., id.* ¶¶ 78-80, 110, 116, 121, 123, 127 (reflecting Board and Audit Committee updates on frequency and severity trends).

not apparent in ProAssurance's paid claims and that management was acting cautiously in response to them.[230] There is no reason why the directors' reliance on these representations could be considered unjustified.[231] And, critically, a higher observed severity trend was disclosed in 2018.[232]

Finally, it bears considering that in the Securities Action, the court rejected substantially identical arguments about alleged misstatements in ProAssurance's public filings regarding the monitoring of frequency and severity trends. The court explained that ProAssurance management "openly acknowledged the various types of data that influenced their assumptions, estimations, and ultimate calculations regarding loss reserves."[233] The court also held that "[t]hough the plaintiffs allege[d] that claim frequency rose precipitously . . . against a backdrop of rising industry-

---

[230] *See, e.g., id.* ¶¶ 126, 131 ("[I]t will be several years before we have concrete information regarding the impact of these [HCPL] losses" given "the long tailed nature of this business."); Defs.' Opening Br. Ex. 16 at '005; Opening Br. Ex. 4 at '582 (reflecting that management adjusted reserves in response to general industry trends); Defs.' Opening Br. Ex. 18 (Aug. 2, 2018 Audit Committee minutes) at '627 (noting that management "continues to take a cautious approach to changes in severity trend"); Defs.' Opening Br. Ex. 19 (Nov. 28, 2018 Board materials) at '523 ("As we have discussed previously we continue to react cautiously to signs that the loss environment in the HCPL market is worsening.").

[231] *See Citigroup*, 964 A.2d at 132 ("[D]irectors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts.") (citing 8 *Del. C.* § 141(e)).

[232] Defs.' Reply Br. Ex. 43 (Aug. 7, 2018 Form 10-Q) ("[W]e have observed potentially higher severity trends in [its] case reserve estimates but these have not been confirmed by actual claim payments."); *supra note* 83 and accompanying text.

[233] *ProAssurance*, 600 F. Supp. 3d at 1207.

wide claim severity, the complaint [wa]s devoid of facts establishing that the defendants entirely ignored these trends and thereby misled investors when they stressed the significance of frequency and severity in their calculations."[234] The Complaint here raises no allegations requiring a different outcome.

### 3. Allegations About Gorrie's Independence

Finally, the plaintiffs allege that demand is excused as to Gorrie due to a "business relationship" between himself and ProAssurance.[235] Gorrie is the President and Chief Executive Officer of Brasfield & Gorrie, Inc. ("B&G"), which "is a controlling member of Hangar 24, LLC . . . of which ProAssurance owns 20% and B&G owns 80%."[236] Hangar 24 leases a hangar at an airport in Birmingham, Alabama where ProAssurance allegedly keeps its corporate aircraft.[237]

It is not apparent to me why this business tie has any bearing on Gorrie's impartiality to evaluate a claim about the TeamHealth account. Beyond that, there are no allegations suggesting that the business relationship is material to Gorrie or B&G.[238] The mere fact that a director has roles in two companies that do business

---

[234] *Id.*

[235] Compl. ¶ 270.

[236] *Id.*

[237] *Id.*

[238] *See e.g.*, *Jacobs v. Yang*, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del. 2005) (TABLE).

together is not enough to show the director's "independent discretion would be compromised."[239]

## III. CONCLUSION

The plaintiffs have failed to plead particularized facts supporting a reasonable inference that a majority of the Demand Board is incapable of impartially considering demand. The defendants' motion to dismiss under Rule 23.1 is granted. This action is dismissed with prejudice.

---

[239] *Khanna*, 2006 WL 1388744, at \*17; *see also Goldman Sachs*, 2011 WL 4826104, at \*12 (rejecting lack of independence allegations where the plaintiff failed "to plead facts that show anything other than a series of market transactions occurred" between a company and entity affiliated with director).